# WIGGINS FERRY COMPANY *v.* OHIO AND MISSISSIPPI RAILWAY COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF ILLINOIS.

No. 27. Argued December 3, 1891. — Decided January 4, 1892.

A ferry company operating a ferry across a navigable river and, owning the land at the landing and about the approaches to it, contracted with a railroad company for the use of the land for the purposes of its business so long as they should be used and employed for such uses and purposes. The railroad company in consideration thereof agreed to pay the taxes on the land, and not to interfere with the ferry company in respect of its ferry, and to always employ the ferry company in its transportation across the river. The railroad company entered upon the land, and laid down tracks and performed its part of the contract until it became insolvent, and a mortgage upon its property was foreclosed. The property was purchased by a new railway company, which continued to carry on the business as it had been carried on before, but without making any new contract, or any special agreement for rent. After continuing to carry on the business in this way for some time, the railway company diverted a portion of its transportation across the river to other carriers. Subsequently a further diversion was made, and then the company became insolvent, and a receiver was appointed. This officer also continued to carry on the business, and without making any special agreement: but eventually he wholly diverted the business and removed all the rails and tracks from the premises. The ferry company then intervened in the suit against the railway company in which a receiver had been appointed, claiming to recover compensation for the use of its property by the railway company and by the receiver, and for the value of the materials removed from the premises when possession was surrendered. The court below dismissed this petition and allowed an appeal. *Held*,

(1) That the contract did not create the relation of landlord and tenant; that no rent having been reserved, or claimed, or paid during the whole occupation, the conduct of the parties was inconsistent with such a relation; and that under such circumstances such a relation would not be implied;

(2) That the railway company, under the circumstances, acquired an equitable estate in the premises of like character with the legal estate previously held by the railroad company; and that both parties were equitably estopped from denying that such was the case;

(3) That the ferry company having, up to the argument in this court, conducted the litigation solely on the theory that it was entitled

as landlord to recover the rental value of the premises in question; this presented a serious obstacle in the way of doing substantial justice between the parties; but,

(4) That a mistaken view of one's rights or remedies should not be permitted wholly to defeat a claim founded upon principles of equity and justice, and if the pleadings can be so amended as to admit proof of such claim, and such amendment does not introduce a new cause of action, though it may set up a new measure of damages, or work a real hardship to the party defendant, it is within the discretion, even of the appellate court, to permit such amendment to be made;

(5) That the ferry company was not entitled to recover the value of the rails removed by the receiver.

It is not necessary that a party should formally agree to be bound by the terms of a contract to which he is a stranger, if, having knowledge of such contract, he deliberately enters into relations with one of the parties, which are only consistent with the adoption of such contract.

Where the judgment in a former action is upon demurrer to the declaration, the estoppel extends only to the exact point raised by the pleadings or decided, and does not operate as a bar to a second suit for other breaches of the same covenants; although if the judgment be upon pleadings and proofs, the estoppel extends not only to what was decided, but to all that was necessarily involved in the issue.

As between landlord and tenant, or one in temporary possession of lands under any agreement whatever for the use of the same, the law is extremely indulgent to the latter with respect to the fixtures annexed for a purpose connected with such temporary possession.

THIS case was argued before six justices on the 14th of October, of the present term. On the 19th of the same month it was ordered to be reargued before a full bench. This was done on the 3d of December. The court, in delivering its opinion, stated the case as follows:

This was an appeal from a final decree dismissing an intervening petition, filed December 21, 1878, by the Wiggins Ferry Company in a suit for the foreclosure of a mortgage upon the property of the Ohio and Mississippi Railway Company. The petitioner was a corporation created in 1853 for the purpose of operating a ferry across the Mississippi River at St. Louis, Missouri. The object of this intervening petition was to obtain compensation for the use and occupation by the railway company, from July 1, 1862, to November 18, 1876,

and by John King, Jr., receiver of the said company, from that date to February 20, 1880, of certain lands, the property of the petitioner, upon Bloody Island, opposite the city of St. Louis, in the county of St. Clair, in the State of Illinois. The Ohio and Mississippi Railroad Company (hereinafter called the railroad company) was a railroad corporation, and in 1851, was authorized by law to construct its road to Illinoistown, now East St. Louis, on the Mississippi River opposite St. Louis; and in 1854, was further authorized to extend its road from Illinoistown across Bloody Island to the main channel of the river. Bloody Island, as well as the land over which it could be conveniently reached, then belonged in fee to the petitioner. On April 1, 1858, the petitioner and the railroad company entered into a written contract, whereby the ferry company granted and conveyed to the railroad company the right to construct, maintain and use upon and over a certain parcel of land on Bloody Island, therein described, such tracks, depots, warehouses and other buildings as the railroad company should find necessary and convenient to be constructed and used for the purpose of its business, together with a right of way over an adjoining piece of land, with the right to have and to hold the same so long as they should be used and employed for the uses and purposes of the railroad, as therein specified, and for no other purpose, even forever.

In consideration thereof, the railroad company covenanted and agreed:

1. To pay all taxes on said parcels of land.

2. That the ferry company should never be hindered or interfered with in respect to its ferry by the railroad company, or by any other person claiming under said contract.

3. That the railroad company should always employ the ferry company to transport for it across the Mississippi River all persons and property that might be taken across said river either way by the railroad company, "to or from Bloody Island," either for the purpose of being transported on the railroad, or having been brought to said river upon said railroad, so that the ferry company, its legal representatives and assigns, should have the profit of the transportation of all

passengers, persons and property taken across the river, either way, by said railroad company, either to or from St. Louis, the ferry company charging for said ferriage as low rates as charged by it to any other party between St. Louis and Bloody Island, which ferriage should be paid by the said railroad company to the ferry company, its legal representatives and assigns, owners of said ferry.

4 and 5. That the railroad company should grade and pave a certain piece of ground across the front of the property, and keep the same open and in repair for a wharf or street for the free passage of all persons, vehicles and property, and that the ferry company should be entitled to wharfage upon the same.

6· and 7. That the railroad company should keep certain streets open for the free passage of all persons.

8. That the lots conveyed should be used for the purpose of right of way, depots and other buildings for the use of the railroad company, and for no other purpose.

Upon the execution of this contract, the railroad company took possession of the premises, and thereafter used and occupied the same in accordance therewith, filled a portion of the grounds, and placed thereon their tracks, buildings and other improvements, and fulfilled the covenants of said contract upon its part until July 1, 1862. At that date the Ohio and Mississippi Railway Company, (hereinafter called the railway company,) a distinct corporation, which had been chartered for the purpose of taking a conveyance of all the property and franchises of the railroad company, which it had purchased at a judicial sale under a decree of foreclosure, took possession of all the property of the said railroad company as said purchaser, and also took possession of the premises described in the said contract. The railroad company then ceased to perform its corporate functions. The railway company was not a reorganization of the railroad company, but a new and totally independent corporation.

Such possession was taken by the railway company with the tacit consent of the petitioner, but without any special agreement for rent; and the premises were held, used and occupied by the railway company with the sufferance and permission of

the petitioner, until November, 1876, when, under proceedings to foreclose a mortgage upon the property of the railway company, a receiver was appointed who took possession of the premises and improvements, also with the tacit consent of the petitioner, but without any special agreement for rent. In respect to this, the answer of the receiver alleged the fact to be that "from the time of the entry into possession of the purchaser up to the present time, the petitioner, the Ohio and Mississippi Railway Company, and this respondent, as its receiver, have treated the contract as in full force and binding upon them, and the said Ohio and Mississippi Railway Company and respondent have always and at all times done and performed all that the terms of the said contract required the said Ohio and Mississippi Railroad Company to do and perform." Immediately upon taking possession of this property, the railway company began filling up, paving and otherwise improving the same at considerable expense, and also filled in its right of way across the adjoining tract described in said contract, and, until about 1871 or 1872, exercised exclusive control over the premises, paid the taxes thereon, and complied with the conditions of the contract of April 1, 1858, giving to the ferry company the transportation of all its passengers and freight across the river at St. Louis. In the summer of 1871, the railway company changed its track from broad to standard gauge, which enabled it, by using the connecting tracks of the Chicago and Alton Railroad Company, on Bloody Island, to transfer freight across the river by the Madison Ferry, at Venice, Illinois, about two and one-half miles north of the Wiggins Ferry; and also by using the East St. Louis and Carondolet Railway, to transfer freight to South St. Louis by the Pacific Ferry, which was about six miles south of the Wiggins Ferry; the Ohio and Mississippi having no tracks of its own connecting either with the Madison or the Pacific Ferry. About 1872, the railway company began to divert their freight from the Wiggins Ferry to the Madison Ferry at Venice, and also to the Pacific Ferry. The officers of the Wiggins Ferry, learning of these diversions, protested against them as breaches of the contract of April 1, 1858, and in 1874 brought an action at law

in the state court of Illinois against the railway company for damages for violating its contract, by transporting freight by means of the Madison Ferry at Venice. A demurrer interposed by the defendant to the declaration was sustained, and final judgment rendered for the defendant, which was affirmed by the Supreme Court of the State at the June term, 1874. 72 Illinois, 360.

In anticipation of the completion of the St. Louis bridge, in 1871 the railway company entered into an agreement with the bridge company, by which it bound itself, so soon as the bridge should be completed, to connect its own tracks with those on the bridge, and to transport over and across said bridge all freight and passengers of the railway company under its control, destined across the river at St. Louis, and to continue this arrangement for ten years. The bridge was completed about June 15, 1874, after which date the railway company ceased to transfer any of its passengers across the river on the boats of the Wiggins Ferry, sending them in omnibuses over the bridge instead and from that time onwards none of the passenger traffic of the said railway company was ever done by the Wiggins Ferry Company, except during a few days in 1877, when the eastern approach to the bridge was burned.

Subsequently, and about 1875, the railway company began to divert its freight from the ferry company to the St. Louis Transfer Company. In 1876, the ferry company brought a second suit in the state court against the railway company, to the declaration in which the defendant demurred. The demurrer was sustained by the Circuit Court, and final judgment entered for the defendant, from which an appeal was taken to the Supreme Court, which affirmed the judgment of the court below. 94 Illinois, 83.

On October 18, 1878, the receiver of said railway company obtained an order authorizing him to erect a new enginehouse upon other ground owned by the railway company, and also to remove to such ground the rails and materials from the land owned by the Wiggins Ferry Company. This order appears to have been obtained without notice to the petitioner. Under this order, the receiver at intervals removed

all railway tracks from the ground in question, against the objections of the ferry company, which claimed that all the tracks, ties, switches and buildings on the property belonged to it, as appurtenant to the freehold. The grounds in question, being those described in the contract of April 1, 1858, remained in possession of the receiver until February, 1880, when their use was finally discontinued by him, and possession surrendered to the ferry company.

On December 21, 1878, the ferry company filed an intervening petition, and on April 27, 1880, an amended petition, claiming compensation for the use and occupation by the railway company and its receiver of the premises in question, from July 1, 1862, to February 20, 1880, and for the value of the materials removed from the premises when possession was surrendered. The defendant, answering, denied all liability, and also pleaded the statute of limitations. The case having been referred to a special master to hear and try the same upon the evidence, he filed his report on April 15, 1886, giving his conclusions of fact and law upon the evidence taken. His conclusions were summarized as follows:

" 1. The deed of April 1, 1858, conveyed to the railroad company an estate of limitation in consideration of the covenants to be performed by it, and when that company ceased to use the premises for the purpose of transacting its business the contingency happened which, by the words of the deed, was to limit the estate, and the estate then *ipso facto* determined.

" 2. Upon the determination of the estate of the railroad company the railway company entered into possession of the premises with the tacit consent of the ferry company ; and, by the mutual acts and acquiescence of these two parties, an equitable estate, of like character as the legal estate which had existed by virtue of the deed, with the same reciprocal rights, privileges and obligations, was created, or at least neither party will be permitted in equity to deny, to the prejudice of the other party, that such was the case.

" 3. The railway company was under equitable obligation, so long as it held the premises, to perform the covenants form-

ing the consideration of the grant, including the covenant pertaining to ferriage, the same as if it had been one of the original contracting parties.

"4. In case of default as to such performance, this court has jurisdiction to award equitable compensation in money to the petitioner under the circumstances in this case.

"5. The defendants have partially failed to perform their equitable obligation as to ferriage.

"6. Equitable compensation will be such sum of money as will, as nearly as may be, place the petitioner in as good condition as that in which it would have been if the obligation as to ferriage had been fully performed.

"7. The extent of such partial failure or the loss sustained by reason thereof do not clearly appear in evidence, and a re-reference to take further testimony on this point is recommended.

"8. The iron rails and other like materials necessary for the purposes of the grant, laid by the defendants and their grantor in the track on the premises, did not become part of the realty, and the defendants had lawful right to remove the same before surrendering the premises."

Exceptions were filed by both parties to his report, upon consideration whereof, the court dismissed the intervening petition at the cost of the ferry company, with the allowance of an appeal.

*Mr. Henry Hitchcock* (with whom were *Mr. George A. Madill* and *Mr. G. A. Finkelnburg* on the brief) for appellant, made the following point as to the iron rails, carried away by the receiver.

The ferry company is entitled to compensation for the railway tracks taken away, against its objection, by the receiver. These were permanently attached to and part of the soil, to which, neither at law nor in equity, did the Ohio and Mississippi Railway Company ever acquire any title. They were not placed there with any view to ultimate removal, and the doctrine of trade fixtures cannot be applied to them. *Galves-*

ton *Railroad* v. *Cowdrey*, 11 Wall. 459, 482; *United States* v. *New Orleans Railroad*, 12 Wall. 362, 365; *Palmer* v. *Forbes*, 23 Illinois, 249; *Lehigh Coal &c. Co.* v. *Central Railroad*, 35 N. J. Eq. (8 Stewart) 379; *Salem Bank* v. *Anderson*, 75 Virginia, 250; *Weetjen* v. *St. Paul & Pacific Railroad*, 4 Hun, 529.

*Mr. Lawrence Maxwell, Jr.*, (with whom were *Mr. Garland Pollard* and *Mr. William M. Ramsey* on the brief,) for appellee.

The suit below being for rent for use and occupation, I contented myself in the former argument with an attempt to show that such an action would not lie. This I did by pointing out that the premises were held under an express contract to furnish ferriage, as one of the considerations for their use, and that, therefore, no implied contract to pay money rent could be inferred. The correctness of this position is now conceded by counsel for the appellant. They admit that an action for use and occupation does not lie, but that their remedy, if any, is for breach of the contract of 1858. They rest their case on this appeal, upon an effort to now convert it from an action for use and occupation into a suit for damages for breach of the contract of 1858. This, we submit, cannot be done.

I. Upon the pleadings and proofs the case is simply one for rent for use and occupation. The sole defence set up by the answer was that the premises since 1862 had been, and then were, held under the contract of 1858, and that thereunder no money rent was due for use and occupation. The amended petition, filed February 27, 1880, repeats the allegation of the original petition, that the railway company in 1862, and the receiver upon his appointment in 1876, severally "with the tacit consent of the petitioner, and without any special agreement for rent therefor, entered upon and took possession of said premises"; it repeats the prayer of the original petition as already quoted, to recover the amounts alleged to be due for use and occupation. There is no allegation that the rail-

way company or the receiver ever assumed or became other-
wise bound by the contract of 1858.

The case was also treated through the entire hearing as one
simply for use and occupation.   The plaintiff offered no evi-
dence except to establish the rental value of the premises, and
to show that they had not been held by the defendant under
the contract of 1858.   There was some proof in a general way
as to the defendant's failure to furnish ferriage, but that was
only for the purpose of establishing the plaintiff's contention
that the contract of 1858 had not been recognized by the par-
ties as being in force.   There was no attempt to offer evidence
as to the amount of ferriage supplied, or as to loss of profits,
such as would have been absolutely necessary if the suit had
been dealt with as one for breach of the contract of 1858.

The master suggested that leave might be given the plain-
tiff to amend the petition so as to convert the suit from one
for use and occupation into one for damages for breach of the
the covenant of ferriage, but the suggestion was declined, and
the plaintiff went to final hearing on the case made by its
intervening petition for use and occupation, and for nothing
else.   The master, assuming that leave to amend might be
asked and obtained, suggested a second reference to supply
the evidence necessary to support the new case, but the plain-
tiff declined that suggestion also, adhered to its case for use
and occupation, as made by the pleadings, and excepted to the
report on the sole ground that the master had decided against
its right to maintain that action.   There can be no doubt but
that the case made by the pleadings and adhered to by the
plaintiff at every stage of the proceedings below, was one for
use and occupation and for nothing else.   The right to recover
under the contract of 1858 was distinctly repudiated.   Such a
right is now asserted in this court for the first time.

II.   In equity the decree must conform to the pleadings.   It
is not permitted to sue on one contract and recover on another.
No recovery is therefore possible in this case for breach of the
contract of ferriage.   The claim is not only wholly different
from that sued for in the petition, but utterly inconsistent with
it.   The existence of the one depends upon the denial of the

other. *Morris* v. *Tillson*, 81 Illinois, 607, 615; *Crocket* v. *Lee*, 7 Wheat. 522, 527; *Legal* v. *Miller*, 2 Ves. Sen. 299; *Shields* v. *Barrow*, 17 How. 130, 144.

III. A prayer for general relief cannot be used to convert a suit for use and occupation into one for breach of a contract of ferriage. It is a fundamental proposition that under a general prayer no relief can be granted which is inconsistent with the special prayer or with the case made by the bill. *English* v. *Foxall*, 2 Pet. 595, 612; *Hobson* v. *McArthur*, 16 Pet. 182, 195; *Hayward* v. *National Bank*, 96 U. S. 611. While a plaintiff who is doubtful of the relief to which he is entitled, may so frame his prayer, that if one species of relief is denied another may be granted, he is never permitted to rely on inconsistent claims. He is not permitted for instance to assert a will to be invalid, and at the same time to ask to take under it if it shall be held to be valid, *Wright* v. *Wilkin*, 4 De G. & J. 141; nor to ask the cancellation of a mortgage, or to redeem it, *Micon* v. *Ashurst*, 55 Alabama, 607; nor to pray to set aside a contract for fraud, or if that be denied to have it specially enforced, *Shields* v. *Barrow*, 17 How. 130.

If the case could have been treated in the Circuit Court as one for breach of the contract of ferriage, the court would nevertheless have been bound to dismiss the bill, for the reason that the plaintiff offered no evidence to support an award of damage.

Mr. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

When the railway company became the purchaser at judicial sale of the property, assets and franchises of the railroad company, it found the latter in possession of a tract of land upon Bloody Island in the Mississippi River, making use of the same for its tracks, depots, warehouses and other terminal facilities, and also sending to and receiving from St. Louis at this point its passengers and freight by steamers not its own. It knew, or was bound to know, that this property did not belong to the railroad company. As the record shows that it remained

in possession of these premises for the next fourteen years, using the same for some nine years of this time as they had before been used, sending its passengers and freight to and from St. Louis in the boats of the ferry company, and, in the language of the answer, "treated the contract as in full force and binding upon them," it must be assumed that it was fully informed of the ownership of such property, and the terms of the contract under which it was held and employed by the railroad company.

(1) Under these circumstances what was the legal relation of the railway company to this contract? In a case between these same parties, (94 Illinois, 83,) the Supreme Court of Illinois held that the covenants contained in the contract of April, 1858, were not such as ran with the land, and that the relationship of landlord and tenant was not created by such contract between the ferry company and the railroad company. Indeed, the fact that the railway company and its receiver continued in the occupation of this property for over seventeen years, with the tacit consent of the ferry company, and without any suggestion of a tenancy or a demand for rent, is sufficient of itself to show that the relations between them were not those of landlord and tenant. Such relationship will never be implied when the acts and conduct of the parties are inconsistent with its existence. In *Carpenter* v. *United States,* 17 Wall. 489, 493, it was held by this court that no reason for the implication of a tenancy existed, "when an express contract or an arrangement between the parties shows that it was not intended by them to constitute the relation of landlord and tenant, but that the occupation was taken and held for another purpose." In that case, it was shown that the entry had been made in pursuance of an agreement to purchase, and it was held that the tenant was not liable for use and occupation if the purchase were actually concluded.

The railway company was not the formal assignee of the interest of the railroad company in such a contract, nor could it become so under the eighth clause of the contract, without the consent of the ferry company. It is a well-established principle that the mere purchase of a railway under a fore-

closure sale by a new corporation does not of itself make such new corporation liable for the obligations of the old one. *Stewart's Appeal*, 72 Penn. St. 291; *Vilas* v. *Milwaukee &c. Railway*, 17 Wisconsin, 497; *Smith* v. *Chicago & Northwestern Railway*, 18 Wisconsin, 17. The railway company, then, upon taking possession of the property of the railroad company, was at liberty to renounce the benefit of such contract, if it chose to do so, or to make such further arrangement with the ferry company as they might be able to agree upon. It did neither, but still maintained possession of the land. In view of the fact that the railway company used this property precisely as it had been used; improved it at great expense, by filling up low places and securing it from the overflow of the river; graded and paved the river front, erected buildings, paid the annual taxes, and, until 1871, employed the ferry company to transport its passengers and freight to and from the city — in short, in the language of the answer, doing and performing "all that the terms of the said contract required the said Ohio and Mississippi Railroad Company to do and perform," we think it must be held in a court of equity to have adopted such contract, and made it its own. This construction certainly consorts with the acts and conduct of both parties, between whom different modifications of the contract were proposed and discussed at different times from 1872 to 1875. Under the circumstances of this case, we agree with the conclusion of the special master, that the railway company acquired an equitable estate in the premises, of like character as the legal estate previously held by the railroad company, which estate was in equity unimpeachable, and that the railway company and the ferry company sustained the same relation as had previously existed under the deed between the railroad company and the ferry company; or, at least, that both parties are equitably estopped from denying that such was the case. It is not necessary that a party should deliberately agree to be bound by the terms of a contract to which he is a stranger, if, having knowledge of such contract, he deliberately enters into relations with one of the parties, which are only consistent with the adoption of such contract. If a

person conduct himself in such manner as to lead the other party to believe that he has made a contract his own, and his acts are only explicable upon that theory, he will not be permitted afterwards to repudiate any of its obligations. 2 Pom. Eq. Juris. sec. 965; *Chicago & Alton Railroad* v. *Chicago &c. Coal Co.*, 79 Illinois, 121. This principle is applicable here, and it results from this that, if the railway company or its receiver has been guilty of a breach of this contract, the petitioner is entitled to recover its damages, by reason of such breach, in this proceeding, unless it has in some way become estopped by the judgments of the state courts of Illinois, or by its own conduct and disclaimers in this suit.

The first action between these parties was brought in 1874, in the St. Clair Circuit Court, and was determined upon a demurrer to the declaration, which alleged a breach of the third covenant of the contract in this, that in November and December, 1873, the defendant wrongfully and without plaintiff's assent, brought to its railroad in East St. Louis and its said depot across the Mississippi River, from the city of St. Louis, in its cars, certain loads of grain to be transported eastwardly on its railroad; and caused said grain in said cars to be transferred across said river, from St. Louis to its depot at East St. Louis, by way of Venice, a village two miles above East St. Louis, on a rival ferry, and also caused certain carloads of coal to be taken in its cars, from East St. Louis, by way of Venice, and thence across the Mississippi River to the city of St. Louis, on said rival ferry. As the contract, which was set out *in hæc verba* in the declaration, provided that the railroad company should employ the ferry company to transport across the river all persons and property which might be taken either way by the railroad company "to or from Bloody Island," there was an apparent variance between the contract and the breach alleged in the declaration, in bringing to its depot in *East St. Louis* the property in question. A demurrer was interposed to this declaration and sustained, and final judgment entered in favor of defendant, an appeal taken to the Supreme Court, and the case affirmed. 72 Illinois, 360. In delivering its opinion, the Supreme Court held that the contract was con-

fined in its operation to the territorial limits of Bloody Island, and that there was nothing in such contract, unless it arose by implication, that prevented the railway company from extending its tracks to Venice, or any other point, however distant, and crossing passengers and freight there for St. Louis or points beyond. The court in that case seems to have assumed that the railway diverted its passengers and freight from Bloody Island altogether, by sending them across the river from points above and below the island. But there is nothing in this decision which estops the ferry company from showing that the railway company did in fact send them to its depot upon Bloody Island, and from there diverted them by tracks of other roads to ferries above and below said island, as was actually the case, and thereby defrauded petitioner of its rights under the contract. If, as a matter of fact, the diversion complained of began after the arrival of the freight at the grounds of the ferry company upon Bloody Island, a different case is presented from that passed upon in this opinion. All that was actually decided was that the ferry company had no right to complain, if the railroad company sent its freight across the river from other points than Bloody Island; and the estoppel extends no farther than this. Where the judgment in the former action is upon demurrer to the declaration, the estoppel extends only to the exact point raised by the pleadings or decided, and does not operate as a bar to a second suit for other breaches of the same covenants, although if the judgment be upon pleadings and proofs, the estoppel extends not only to what was decided, but to all that was necessarily involved in the issue. *Wash. & Alexandria Packet Co.* v. *Sickles,* 24 How. 333; *S. C.* 5 Wall. 580; *Gould* v. *Evansville &c. Railway,* 91 U. S. 526; *Boyd* v. *Alabama,* 94 U. S. 645; *Russell* v. *Place,* 94 U. S. 606, 608; *Morrell* v. *Morgan,* 65 California, 575.

The second action was brought in 1876, in the same court, against the railway company as assignee of the railroad company, also upon the covenants contained in the third clause of the contract, and, like the former, was disposed of upon demurrer to the declaration, which sought to charge the defendant as

the legal representative and assignee of the railroad company in said contract.  The Supreme Court (94 Illinois, 83) affirmed the judgment of the court below sustaining the demurrer to said declaration, upon the ground that the covenant that the railroad company would always employ the ferry company to transport for it all persons and property across the Mississippi River, was not a covenant running with the land.  The opinion states that "the suit is against one corporation averred to be the assignee of another, upon a covenant made by the alleged assignor.  There is no express undertaking, averred in the declaration, by the assignee to perform the covenant of the assignor, nor is there any averment therein from which such an undertaking can be held to be legally implied.  The only ground upon which there can be any reasonable pretence to base an argument in favor of the right to recover is, that the covenant is one which in legal contemplation runs with the land, and it will, therefore, only be important to inquire whether this is such a covenant."  The opinion then discusses the requisites of such a covenant, the nature of the grant to the railroad company, and holds that such covenants did not create the relation of landlord and tenant, but only an easement, which was not for life, for years or at will, but was a freehold of inheritance, answering to the accepted description of a base or qualified fee.  It also held that the covenant sued on was not one the performance or non-performance of which affected the nature, quality or value of the property demised; the easement granted being in the two parcels of land, not in the ferry, while the covenant was purely a collateral covenant affecting the ferry only, and, therefore, not one running with the land.  The decision was carefully guarded, the court observing that it was not pertinent to inquire whether the appellants had a remedy in equity, or in some other action at law, and that the decision went no further than the matters specially noticed.  The case, which was determined solely upon common law principles, is no estoppel to an equitable proceeding like this to obtain compensation for the use and enjoyment of the petitioner's property.

The most serious obstacle in the way of doing substantial

justice in this case arises from the attitude assumed by the petitioner throughout the entire proceedings in the Circuit Court, that it was entitled to recover the rental value of the premises in question. Up to the time of the appeal to this court, the litigation was conducted solely upon this theory. The original petition contained no reference to the contract of 1858, nor any claim on the part of the ferry company that performance of the covenants for ferriage was the consideration for the use of the land in question. It averred simply that the railway company, with the consent of the petitioner, took possession of the lands owned by it, and, by the sufferance and permission of the petitioner, used and occupied the same without any special agreement for rent, and sought to charge the company for the value of such use and occupation, and to enjoin the receiver from removing the tracks and other property belonging to or attached to the freehold, upon which petitioner claimed a lien. While the amended petition set forth the contract of 1858, the possession of the premises by the railroad company, and the purchase and entry into possession by the defendant under the covenants of the contract, it assumed that the judgment of the Supreme Court in the first case above mentioned, estopped the receiver from setting up or claiming that either he or the railway company ever held said premises under or by virtue of said contract; averred that neither he nor the railway company had paid petitioner anything for the occupation of said premises; claimed that it was entitled to receive a reasonable and just compensation for such use and occupation during the time the premises were held by the railway company or the receiver; and prayed for such just and reasonable compensation for the use and occupation, as well as an account of all property and material removed from the premises, and for general relief. Even after the master had reported his opinion that the estate conveyed by the deed of 1858 was determined, and that an equitable estate of like character as the legal estate which had existed by virtue of the deed was created, and that the railway company was under equitable obligation, so long as it held the premises, to perform the covenants forming the consideration of the grant, and had

recommended a reference to ascertain the equitable compensation to which the petitioner was entitled, the ferry company refused to act upon such recommendation, and excepted to the report upon the ground that the master failed to find that the relation of landlord and tenant existed between the petitioner and the railway company.  In view of these facts and of the persistency with which it has pressed its claim for rent, and repudiated its right to recover under the contract, it would have no just cause of complaint if this court refused to permit a change of front, and affirmed the decree of the court below. Did this disposition of the case involve anything less than a total and final denial of any right whatever to compensation for the use of this property, it might be proper to do this. There is much to be said, however, in favor of the equity of petitioner's claim to an equivalent for the benefit the defendants have received from the use of this property, and we do not consider it beyond the power of this court, upon broad principles of justice, to refer this cause back for such further proceedings as are permitted by the rules and practice of courts of equity.

When the facts of the case show the plaintiff to have an equitable title to relief, this court, while it may be unable to afford such relief upon the case made by the bill, has in several instances asserted its power to remand the case to the court below for an amendment of the pleadings and such further proceedings as may be consonant with justice.  In *Crocket v. Lee*, 7 Wheat. 522, plaintiff filed a bill to obtain a conveyance of land covered by a certificate of settlement right, the legal title to which was in the defendant, and he was decreed by the court below, in conformity with another bill filed by the defendant, to convey to the defendant the land covered by his patent.  It was contended in the Supreme Court that the defendant ought not to be allowed to recover on his cross-bill by reason of his failure to make the proper averments with respect to the invalidity of the plaintiff's title.  The court adopted the view of the appellant in this particular, but remanded the case with directions to permit the parties to amend their pleadings. In *Watts v. Waddle*, 6 Pet. 389, this court affirmed the decree

of the Circuit Court refusing the specific execution of a con-
tract, but, after reviewing the evidence in detail, it further
ordered that to give relief for the rents and profits of the land
in controversy, the decree of the Circuit Court, dismissing the
bill, should be opened, and the case remanded for further pro-
ceedings in conformity with law and justice. In delivering the
opinion of the court, Mr. Justice McLean observed that " a new
ground of relief has been assumed in the argument here that
was not made in the Circuit Court, which is, that although
this court should be of the opinion that a specific execution of
the contract ought not to be decreed, still the complainants are
entitled to a decree for the rents and profits of the land, while
it was in the possession of the defendants. . . . There is
no rule of court or principle of law, which prevents the com-
plainants from assuming a ground in this court, which was not
suggested in the court below; but such a course may be pro-
ductive of much inconvenience and of some expense." So in
*Parkhurst* v. *Van Cortlandt*, 1 Johns. Ch. 273, where posses-
sion had been taken of land, and improvements made, under
an imperfect agreement for purchase, though the court would
not grant relief upon the ground of part performance, yet the
bill was maintained for the purpose of affording the party
reasonable compensation for beneficial and lasting improve-
ments. See also *Walden* v. *Bodley*, 14 Pet. 156; *Neale* v.
*Neales*, 9 Wall. 1; *Hardin* v. *Boyd*, 113 U. S. 756.

In the case under consideration, while the prayer of the pe-
tition is for compensation for use and occupation, its present
claim for an assessment of damages under the contract is not
inconsistent with the allegations of the petition, which are,
that " the railway company, defendant, after taking possession
of said premises, as aforesaid, observed and kept, until the sum-
mer of 1871, some of the covenants of said contract, which
were to have been kept and performed by its said predecessor
in the ownership of said line of railroad, . . . and thereby
induced your petitioner to believe, and it did believe, that said
railway company had adopted said contract as its own, and that
it would continue to observe and keep the covenants thereof
which were to have been kept and performed by the said railroad

company, and that by reason of its having taken possession of said premises, and held, used and occupied the same as aforesaid, it thereby became and was legally bound, as the successor of said railroad company in the ownership of said line of railroad, to keep and perform the covenants of said contract," etc.   It then alleged the failure and neglect to employ petitioner to do its ferriage, and that it " totally ignored and repudiated said contract, and denied any and all obligations to carry out any of the covenants," etc., and averred a loss of profits thereby in the sum of $150,000.   We have shown that the inference it draws from all this, namely, that it is entitled to have a just and reasonable compensation for the use and occupation of said premises, is untenable, but it does not necessarily follow that it is wholly remediless.   Rules of pleading are made for the attainment of substantial justice, and are to be construed so as to harmonize with it if possible.   A mistaken view of one's rights or remedies should not be permitted wholly to defeat a claim founded upon principles of equity and justice, and if the pleadings can be so amended as to admit proof of such claim, and such amendment does not introduce a new cause of action, though it may set up a new measure of damages, or work a real hardship to the party defendant, it is within the discretion even of the appellate court to permit such amendment to be made.   *Schooner Anne* v. *United States*, 7 Cranch, 570.

(2) We agree with the court below that the petitioner is not entitled to recover the value of the rails removed by the receiver from the premises upon Bloody Island.   They were laid there under a mere easement granted by the petitioner, and obviously with no intention that they should become part of the realty. As between landlord and tenant, or one in temporary possession of lands under any agreement whatever for the use of the same, the law is extremely indulgent to the latter with respect to the fixtures annexed for a purpose connected with such temporary possession.   It is incredible that it could have been the intention of the parties that the rails and switches laid upon this ground by the railroad company should become the property of the landlord, when, by the terms of the contract, the ferry company had the right to put an end to it at

any time upon six months' notice. In *Van Ness* v. *Pacard*, 2 Pet. 137, it was held that a house built by a tenant upon land, primarily for the purpose of a dairy, and incidentally for a dwelling house for the family, did not pass with the land. The earlier authorities are reviewed in that case by Mr. Justice Story, and the conclusion reached, that whatever is affixed to the land by the lessee for the purpose of trade, whether it be made of brick or wood, is removable at the end of the term. Indeed, it is difficult to conceive that any fixture, however solid, permanent and closely attached to the realty, placed there for the mere purposes of trade, may not be removed at the end of the term. In the case of *Wagner* v. *Cleveland & Toledo Railroad*, 22 Ohio St. 563, it was held that stone piers built by a railroad company as part of its road on lands over which it had acquired the right of way, did not, though firmly imbedded in the earth, become the property of the owner of the land, as part of the realty; and that, upon the abandonment of the road, the company might remove such structures as personal property. So in *Northern Central Railroad* v. *Canton Co.*, 30 Maryland, 347, it was held that the rails fastened to the roadbed of a railroad, as well as the depots and other buildings, might, under certain circumstances, be treated as trade fixtures, and removable by the company, if the surrounding circumstances showed that at the time the rails were laid upon the land it was not intended that they should be merged in the freehold. In that case the road was built upon land under a license and permission of the owner. It is entirely clear that the rails in the case under consideration did not become part of the realty, and that the receiver was not guilty of waste in removing them from the land.

But for the reasons above stated, and under the peculiar and exceptional circumstances of this case, we think the decree of the court below should be

*Reversed, but without costs, and the case remanded for such further proceedings as may be consonant with justice and in conformity to this opinion.*